UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-22669-MARTINEZ/AOR

PATRICIA BENAVIDES,

      Plaintiff,

v.

ANDREW SAUL,[1]
Commissioner for,
Social Security Administration,

      Defendant.

_____ /

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Plaintiff Patricia Benavides' ("Claimant") Motion for Summary Judgment (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 22] and Defendant Andrew Saul, Commissioner of the Social Security Administration's ("Commissioner") Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 24]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 11].[2]  For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

## PROCEDURAL HISTORY

In February 2016, Claimant filed applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging a disability onset

---

[1] Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

date of June 17, 2015.   TR. 258–66.   The applications were denied initially and upon reconsideration.  Id. at 104–61.  Pursuant to a written request, a hearing was held on April 25, 2018 before Administrative Law Judge Norman Hemming ("ALJ Hemming") at which Claimant and Vocational Expert Lorin Lovely ("VE Lovely") testified.  Id. at 48–102.  On July 24, 2018, ALJ Hemming issued an Unfavorable Decision, finding that:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2020.  Id. at 22.

(2) Claimant had not engaged in substantial gainful activity since June 17, 2015, the alleged onset date (20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).  Id.

(3) Claimant had the following severe impairments: fracture of the upper extremity and disorders of the muscle, ligament, and fascia (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  Id. at 25.[3]

(5) Claimant had the residual functional capacity ("RFC") to perform light work subject to additional limitations.  Id. at 25–26.[4]

(6) Claimant was unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).  Id. at 29.[5]

---

[3] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a) and 416.925(a).

[4] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments.  20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1).  The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 404.1520, 404.1545, 416.920, and 416.945.
"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b) and 416.967(b).

[5] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

(7) Claimant was born on July 3, 1973 and was 41 years old, which was defined as a younger individual age 18–49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963). Id. at 30.

(8) Claimant had at least a high school education and was able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964). Id.

(9) Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled," whether or not Claimant had transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2). Id.[6]

(10) Considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)). Id.

(11) Claimant had not been under a disability, as defined in the Social Security Act, from June 17, 2015, through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)). Id. at 31.

On May 9, 2019, the Appeals Council denied a request for review of ALJ Hemming's Unfavorable Decision. Id. at 1–8. On June 26, 2019, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Hemming's final administrative decision [D.E. 1].

In support of her contention that ALJ Hemming's Unfavorable Decision should be reversed, Claimant argues that:

I.      The ALJ's step two and mental RFC findings are internally inconsistent, and the ALJ erred in rejecting the treating and examining medical source opinions regarding mental impairments and limitations.

II.     The ALJ's finding that Claimant had no limitation on finger use is unsupported by substantial evidence.

III.    The ALJ erred in rejecting the opinions of all three of Claimant's treating physicians and adopting a non-examining, projected opinion instead.

---

[6] SSRs are a series of precedential decisions relating to the programs administrated by the SSA and are published under the authority of the Commissioner of Social Security. See http://ssa.gov/regulations/def-ssr.htm.

3

IV.     The ALJ failed to properly consider Claimant's allegations of pain and limitations.

See Claimant's Motion for Summary Judgment [D.E. 22 at 5–19].

**RELEVANT MEDICAL EVIDENCE**

I.      **Treating Sources**

        A.  **Broward Health Medical Center ("BHMC")**

On June 17, 2015, Claimant was involved in a motor vehicle accident and admitted to BHMC via the emergency department for treatment.  Id. at 631.  Imaging studies showed: a nondisplaced radial styloid fracture with intraarticular extension of Claimant's right wrist; and a widening of her right acromioclavicular ("AC") joint, which suggested a ligamentous injury of her right shoulder.  Id. at 635–51.  The assessment and plan following Claimant's examination were that she might benefit from operative fixation of her wrist injury and that her AC injury could most likely be managed nonoperatively.  Id. at 614.

On June 23, 2015, Brian Cross, D.O. ("Dr. Cross") surgically repaired Claimant's right wrist injury by performing an open reduction and internal fixation of the fracture to her right distal radius, which required the implantation of a radial styloid plate.  Id. at 618–20.

        B.  **Dr. Cross**

Claimant continued visiting Dr. Cross from July 8, 2015 to April 12, 2016.  Id. at 566–84, 1006–59.

On July 8, 2015, Claimant reported that she had no complaints and that her pain was well controlled; and she denied experiencing numbness, tingling, paralysis, or paresthesias.  Id. at 573. On physical examination, Dr. Cross noted that: there was posttraumatic edema in the digits of Claimant's right hand; Claimant was able to flex and extend her metacarpophalangeal ("MCP") and interphalangeal ("IP") joints independently; there was diminished sensation in the distribution of the sensory branch of the radial nerve along the dorsum of her thumb; and she had no pain with

4

passive stretch.  Id.

On July 21, 2015, Dr. Cross noted that Claimant had a limited range of motion in her right wrist joint.  Id. at 572.

On August 4, 2015, Claimant reported that she had no complaints.  Id. at 571.  On physical examination, Dr. Cross noted that Claimant exhibited limited postsurgical and posttraumatic stiffness and recommended that she begin hand therapy. Id.

On September 15, 2015, Claimant complained of non-radiating pain in her right shoulder and significant stiffness; she denied experiencing numbness, tingling, paralysis, or paresthesias; and she reported that she was overall very happy with her surgical outcome.  Id. at 569.  On physical examination of Claimant's right wrist, Dr. Cross noted that: Claimant had limited dorsiflexion; she still had some stiffness in her MCP and IP joints, but she was able to make a full fist; and she had full pronation and supination.  Id.  On physical examination of Claimant's right shoulder, Dr. Cross noted that: Claimant's range of motion was 0–180 degrees in forward flexion, with pain from 160–180 degrees; she had pain with abduction greater than 110 degrees; she had full internal and external rotation without pain; and there was tenderness to palpation.  Id. at 569–70.  Dr. Cross' impression was that Claimant had a type 3 AC joint separation and subacromial impingement with possible rotator cuff pathology.  Id. at 570.

On February 2, 2016, Claimant complained of pain in her right shoulder and significant pain and weakness in the ulnar aspect of her right wrist.  Id. at 566.  On physical examination, Dr. Cross noted that: there was dorsal wrist deformity with subluxation of the carpus; there was acute bony tenderness over the distal radial ulnar joint on the right; and Claimant's grip strength and thumb retropulsion were limited.  Id. at 567.  Dr. Cross' impression was that Claimant suffered from posttraumatic chronic right wrist pain and instability, a partial thickness tear of the right rotator cuff, and a superior labral tear from anterior to posterior ("SLAP") lesion of the right

5

shoulder.  Id. at 568.  Dr. Cross noted that Claimant was not progressing as he had hoped and recommended removal of the hardware installed in her right wrist during the June 23, 2015 surgical procedure.  Id. at 566, 568.

On February 18, 2016, Dr. Cross removed the hardware implanted in Claimant's right wrist.  Id. at 591–93.  Imaging studies taken of her right wrist following the procedure showed no acute fracture and mild narrowing of the radiocarpal joint space.  Id. at 603.

On March 2, 2016, Claimant complained of right wrist pain and diminished sensation in the distribution of the superficial branch of the radial nerve; but she denied experiencing any new numbness, tingling, paralysis, or paresthesias.  Id. at 826.   On physical examination, Dr. Cross noted that limited range of motion remained.  Id. at 828. Claimant also underwent imaging studies of her right wrist, which showed radiocarpal joint osteoarthritis.  Id. at 1031.  Claimant was instructed to continue undergoing occupational therapy.  Id. at 829.

On April 12, 2016, Claimant reported that the pain over the ulnar aspect of her wrist joint remained unchanged and that the numbness and tingling with "electric shocks" she experienced on the radial aspect appeared to be improving.  Id. at 839.  On physical examination, Dr. Cross noted that: dorsiflexion of the right wrist was approximately 60 degrees and volar flexion was 40 degrees; Claimant's grip strength was rated a 5/5; her sensation was diminished in the distribution of the superficial sensory branch of the radial nerve; there was tenderness to palpation over the triangular fibrocartilage complex ("TFCC"); and there was ulnar-sided wrist pain with power grip. Id. at 841.  Dr. Cross noted that imaging studies reviewed during the visit showed a complex tear of the TFCC ligaments and significant posttraumatic osteoarthritic changes.  Id.  Dr. Cross referred Claimant to Dr. Jim Fletcher, M.D., ("Dr. Fletcher") for evaluation and treatment of the TFCC tear and recommended that she continue with occupational therapy.  Id.

### C.  Baptist Hospital Rehabilitation Center ("BHRC")

Pursuant to Dr. Cross' referral, Claimant underwent occupational therapy at BHRC from August 11, 2015 to February 2, 2016.  Id. at 437–557.

### D.  Coral Gables Hospital ("CGH")

On January 16, 2016, Claimant visited CGH complaining of dizziness and vertigo, which she associated with symptoms of confusion, headaches, lightheadedness, nausea, and episodes of slurred speech; but she denied experiencing depression, anxiety, gait disturbance, tingling, weakness, and numbness.  Id. at. 371, 377–78.  On physical examination, it was noted that: Claimant did not have spinal or costovertebral tenderness; her back and musculoskeletal exam revealed a full range of motion; she was alert and oriented to person, place, time, and situation; her motor strength was rated a 5/5 in all extremities; her gait was normal; her behavior, mood, and affect were within normal limits; and she was not in acute distress.  Id. at 378–79.  Claimant was diagnosed with dizziness and vertigo, prescribed medication, and discharged home in stable condition.  Id. at 380.

### E.  Baptist Hospital of Miami ("Baptist Hospital")

On January 23, 2016, Claimant underwent imaging studies of her right shoulder at Baptist Hospital which showed: tendinopathy of the supraspinatus and infraspinatus with high-grade partial-thickness undersurface tear of the infraspinatus; low-grade partial-thickness tear and short segment delamination of the supraspinatus; mild subacromial and subdeltoid bursitis; low grade AC joint separation with disruption of the AC ligament without elevation of the distal clavicle in relation to the acromial process; and a minimally propagating nondisplaced SLAP tear.  Id. at 564.

### F.  Doctor's Hospital

On March 8, 2016, Claimant underwent imaging studies of her right wrist at Doctor's Hospital which showed significant scarring and tight joint space in the radiocarpal joint and a high-

grade TFCC tear.  Id. at 716, 718.

### G.  Jesse Z. Shaw, D.O. ("Dr. Shaw")

From April 15, 2016 to February 26, 2018, Claimant visited Dr. Shaw, an orthopedist, who rendered diagnoses of: strain of muscle and tendon of the rotator cuff of right shoulder; unspecified dislocation of right AC joint; sprain of the right rotator cuff capsule; right shoulder derangement; right shoulder rotator cuff tear with impingement syndrome; disorder of ligament, right shoulder; pain in right elbow; unspecified sprain of right elbow; contusion of right elbow; disorder of ligament, right elbow; other synovitis and tenosynovitis, right upper arm; sprain of unspecified site of left knee; unspecified internal derangement of left knee; pain in left knee; and lateral epicondylitis, right elbow.  Id. at 848–51, 996–1003, 1103–57.

On April 15, 2016, Claimant complained of right shoulder pain; but she denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 848. On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact.  Id. at 849.  On right shoulder examination, Dr. Shaw noted that: there was tenderness; there was decreased active motion due to pain; there was full passive range of motion with pain; and Claimant's muscle strength was rated a 3/5.  Id.

On June 3, 2016, Claimant complained of weakness and trouble with her range of motion; but she denied experiencing incoordination, dizziness, and feeling depressed or anxious.  Id. at 1154. On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact.  Id. at 1154–55.  On right shoulder examination, Dr. Shaw noted that there was tenderness; decreased active motion due to pain; and full passive range of motion with pain; and that Claimant's muscle strength was rated a 3/5.  Id. at

1155.  On examination of Claimant's lower extremities, neck, and low back, Dr. Shaw noted that: there was no tenderness, deformity, or injury; there was unremarkable range of motion; there was no gross instability; and Claimant's strength and tone were normal.  Id.  Dr. Shaw's impression was that Claimant had a right shoulder rotator cuff tear/labral tear, for which she agreed to undergo surgical repair.  Id.

On July 5, 2016, Claimant underwent the following surgical procedures: a right shoulder arthroscopy; a right rotator cuff repair; and a subacromial decompression.  Id. at 983.

On July 18, 2016, Claimant reported that she was doing well and only had mild pain at the time.  Id. at 1150.  On right shoulder examination, Dr. Shaw noted that Claimant's elbow, wrist, and hand exams were unremarkable, without distal neurovascular deficit.  Id.

On August 26, 2016, Claimant reported that she was doing well and had mild pain.  Id. at 1148.  On right shoulder examination, Dr. Shaw noted that: Claimant's elbow, wrist, and hand exams were unremarkable, without distal neurovascular deficit; and that her range of motion was appropriate for that post-surgery time.  Id.  Dr. Shaw also noted that Claimant would begin the first phase of her physical therapy.  Id.

On September 23, 2016, Claimant reported that she was doing well and had pain at times with limited range of motion.  Id. at 1146.  On right shoulder examination, Dr. Shaw noted that: Claimant's elbow, wrist, and hand exams were unremarkable, without distal neurovascular deficit; and that her range of motion was appropriate for that post-surgery time.  Id. Dr. Shaw also noted that Claimant would be starting physical therapy to increase her range of motion.  Id.

On November 4, 2016, Claimant reported that she was undergoing physical therapy and continued to have improvement with her pain and range of motion.  Id. at 1144.  On right shoulder examination, Dr. Shaw noted that: Claimant's elbow, wrist, and hand exams were unremarkable, without distal neurovascular deficit; and that her range of motion was appropriate for that post-

surgery time.  Id.  Dr. Shaw also noted that Claimant would be starting the second phase of her physical therapy.  Id.

On December 16, 2016, Claimant complained of right shoulder pain at times with limited range of motion; reported that she was unable to complete her physical therapy due to problems with her insurance; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 1142. On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact. Id. at 1142–43.  On right shoulder examination, Dr. Shaw noted that: there was no tenderness or crepitus; Claimant's range of motion was 60 degrees for external rotation, 90 degrees for internal rotation, 180 degrees for forward flexion, and 60 degrees for extension; her strength was rated a 5/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal.  Id. at 1143.  Dr. Shaw also noted that Claimant was doing well.  Id.

On January 25, 2017, Claimant complained of right shoulder and left knee pain; reported that she was unable to attend physical therapy due to problems with her insurance; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 1139. On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact.  Id. at 1139–40.  On right shoulder examination, Dr. Shaw noted that: there was no swelling, tenderness, or crepitus; there was full range of motion; Claimant's strength was rated a 5/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal.  Id. at 1140.  On left knee examination, Dr. Shaw noted that: there was no swelling or crepitus; there was marked tenderness; Claimant's range of motion was from 0 to 110 degrees; her strength was rated a 5/5 in all muscle groups tested; her

10

sensations were intact; her reflexes were normal and symmetrical; and her gait was antalgic favoring the affected side.  Id.  Claimant was ordered to continue undergoing physical therapy for her shoulder.  Id.

On March 1, 2017, Claimant complained of pain at times with limited range of motion; reported undergoing physical therapy, with little improvement; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 1130.  On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact.  Id. at 1131.  On right shoulder examination, Dr. Shaw noted that: there was no swelling, tenderness, or crepitus; Claimant's range of motion was 60 degrees for external rotation, 90 degrees for internal rotation, 180 degrees for forward flexion, and 60 degrees for extension; her strength was rated a 5/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal.  Id. at 1131.  On left knee examination, Dr. Shaw noted that: there was mild swelling and mild to moderate tenderness; there was full range of motion in all areas tested; Claimant's strength was rated a 5/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was normal.  Id.  Dr. Shaw ordered that imaging studies be taken of Claimant's left knee and instructed her to continue with physical therapy.  Id. at 1132.

On May 16, 2017, Claimant complained of right shoulder, right elbow, and left knee pain; reported that she was unable to attend physical therapy due to problems with her insurance and that her treatment had not alleviated her symptoms; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 1126–27.  On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep

tendon reflexes were intact.  Id. at 1127.  On right shoulder examination, Dr. Shaw noted that: there was no swelling; there was positive tenderness; there was decreased range of motion secondary to pain and weakness; Claimant's strength was rated a 3/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal.  Id.  On right elbow examination, Dr. Shaw noted that: there was no swelling; there was tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in her wrist flexors and extensors and elbow flexors and extensors; her sensations were normal in all areas tested; and her reflexes were normal and symmetrical.  Id.  On left knee examination, Dr. Shaw noted that: there was mild to moderate swelling and positive tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was normal.  Id. at 1127–28.  On exam of Claimant's lower extremities, neck, and low back, Dr. Shaw noted that: Claimant did not exhibit any tenderness, deformity, or injury; her range of motion was unremarkable; there was no gross instability, and her strength and tone were normal.  Id. at 1128.  Claimant was instructed to undergo physical therapy and commence using anti-inflammatory medication.  Id. at 1129.

On June 13, 2017, Claimant complained of right shoulder, right elbow, and left knee pain; reported that she was unable to attend physical therapy due to problems with her insurance and that treatment had not alleviated her symptoms; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 1122–23.  On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact.  Id. at 1123.  On right shoulder examination, Dr. Shaw noted that: there was swelling and tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's

12

strength was rated a 3/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal. Id. On left knee examination, Dr. Shaw noted that: there was mild swelling and tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was antalgic. Id. at 1123–24. On exam of Claimant's lower extremities, neck, and low back, Dr. Shaw noted that: Claimant did not exhibit any tenderness, deformity, or injury; her range of motion was unremarkable; there was no gross instability; and her strength and tone were normal. Id. at 1124. Claimant was again instructed to undergo physical therapy. Id.

On August 1, 2017, Claimant complained of right shoulder and left knee pain; reported that undergoing physical therapy failed to alleviate her symptoms; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious. Id. at 1118. On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact. Id. at 1119. On right shoulder examination, Dr. Shaw noted that: there was no swelling; there was mild tenderness and crepitus; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal. Id. On left knee examination, Dr. Shaw noted that: there was no swelling, crepitus, or tenderness; there was a full range of motion; Claimant's strength was rated a 5/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was normal. Id. On right elbow examination, Dr. Shaw noted that: there was no swelling; there was tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in her wrist flexors and extensors and elbow flexors and extensors; her sensations were

normal in all areas tested; and her reflexes were normal and symmetrical.  Id.  On examination of Claimant's right lower extremity, left upper extremity, neck, and low back, Dr. Shaw noted that: Claimant did not exhibit any tenderness, deformity, or injury; her range of motion was unremarkable; there was no gross instability; and her strength and tone were normal.  Id. at 1119–20.  Dr. Shaw instructed Claimant to continue undergoing physical therapy.  Id. at 1120.

On August 29, 2017, Claimant complained of persistent pain and inflammation in her right elbow and shoulder; reported that she had been undergoing physical therapy and had experienced some improvement; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 1115–16.  On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact. Id. at 1116.  On right shoulder examination, Dr. Shaw noted that: there was no swelling; there was tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal.  Id.  On left knee examination, Dr. Shaw noted that: there was no swelling; there was tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was normal.  Id.  On right elbow examination, Dr. Shaw noted that: there was no swelling; there was tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in her wrist flexors and extensors and elbow flexors and extensors; her sensations were normal in all areas tested; and her reflexes were normal and symmetrical.  Id. at 1116.  Claimant was instructed to resume physical therapy and take the anti-inflammatories prescribed to her.  Id. at 1117.

14

On November 28, 2017, Claimant complained of right shoulder, right elbow, and left knee pain, which had not subsided since her last visit; she reported that she had not been able to resume physical therapy because she had been out of town; and she denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious. Id. at 1112. On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact. Id. at 1112–13. On right shoulder examination, Dr. Shaw noted that: there was no swelling; there was tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal. Id. at 1113. On left knee examination, Dr. Shaw noted that: there was mild swelling; there was tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was antalgic. Id. On right elbow examination, Dr. Shaw noted that: there was no swelling; there was tenderness; there was no restriction of elbow motion; Claimant's strength was rated a 4/5 in her wrist flexors and extensors and elbow flexors and extensors; her sensations were normal in all areas tested; and her reflexes were normal and symmetrical. Id. On exam of Claimant's right lower extremity, left upper extremity, neck, and low back, Dr. Shaw noted that: Claimant did not exhibit any tenderness, deformity, or injury; her range of motion was unremarkable; there was no gross instability; and her strength and tone were normal. Id. at 1113–14. Claimant was prescribed medication and instructed to continue physical therapy. Id. at 1114.

On January 9, 2018, Claimant complained of right shoulder, right elbow, and left knee pain; reported that her medication and physical therapy regimen allowed her to "further progress her strength and range of motion"; and denied experiencing incoordination, dizziness, weakness,

and feeling depressed or anxious.  Id. at 1109.  On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact.  Id. at 1110.  On right shoulder examination, Dr. Shaw noted that: there was no swelling; there was mild tenderness and crepitus; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal.  Id.  On left knee examination, Dr. Shaw noted that: there was no swelling, crepitus, or tenderness; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was normal.  Id.  On right elbow examination, Dr. Shaw noted that: there was no swelling or restriction of elbow motion; there was tenderness; Claimant's strength was rated a 4/5 in her wrist flexors and extensors and elbow flexors and extensors; her sensations were normal in all areas tested; and her reflexes were normal and symmetrical.  Id.  On examination of Claimant's right lower extremity, left upper extremity, neck, and low back, Dr. Shaw noted that: Claimant did not exhibit any tenderness, deformity, or injury; her range of motion was unremarkable; there was no gross instability; and her strength and tone were normal.  Id. at 1110–11.  Claimant was instructed to continue physical therapy and to take her prescribed medication.  Id. at 1111.

On February 20, 2018, Claimant complained of right shoulder, right elbow, and left knee pain; reported that she had begun physical therapy the week prior, which allowed her to "further progress her strength and range of motion"; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 1106.  On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were

intact.  Id. at 1107.  On right shoulder examination, Dr. Shaw noted that: there was no swelling; there was mild tenderness, but not evident crepitus; there was decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensation to light touch was intact; and her deep tendon reflexes were normal.  Id.  On left knee examination, Dr. Shaw noted that: there was mild swelling, tenderness, and decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was antalgic.  Id.  On right elbow examination, Dr. Shaw noted that: there was no swelling or restriction of elbow motion; there was tenderness; Claimant's strength was rated a 5/5 in her wrist flexors and extensors and elbow flexors and extensors; her sensations were normal in all areas tested; and her reflexes were normal and symmetrical.  Id.  On examination of Claimant's right lower extremity, neck, and low back, Dr. Shaw noted that: Claimant did not exhibit any tenderness, deformity, or injury; her range of motion was unremarkable; there was no gross instability; and her strength and tone were normal.  Id. at 1107–08. Claimant was instructed to undergo physical therapy.  Id. at 1108.

On February 26, 2018, Dr. Shaw completed a Physical Medical Source Statement for Claimant.  Id. at 1098–101.  Dr. Shaw identified Claimant's diagnoses as: right shoulder rotator cuff repair; left knee internal derangement; right lateral epicondylitis; and cervical protrusion.  Id. at 1098.  Dr. Shaw identified Claimant's symptoms as: shoulder pain (chronic) after surgery, decreased range of motion, and weakness; severe cervical radiculopathy to bilateral upper extremities; and left knee pain.  Id.  Dr. Shaw opined that, as a result of Claimant's impairments, she would have the following functional limitations if placed in a competitive work situation:

> ➢ She could: walk 2 city blocks without rest or severe pain; sit at one time for 1 hour
> before needing to get up; stand at one time for 1 hour before needing to sit down or
> walk around; sit and stand/walk for less than 2 hours, with normal breaks, in an 8-hour

working day; rarely lift and carry less than 10 pounds; and occasionally twist, stoop, crouch/squat, climb stairs, and climb ladders.

➢ Her symptoms would likely be severe enough to interfere with the attention and concentration needed to perform even simple work tasks 5% of the workday.

➢ She was capable of low stress work because of physical pain in her right shoulder and cervical spine.

Id. at 1098–101.  Dr. Shaw also opined that Claimant had significant limitations with reaching, handling, or fingering and indicated the following percentages of time during an 8-hour working day that Claimant could use her hands/fingers/arms for the following activities:

➢ Hands to grasp, turn, and twist objects:
  o Right – 95%
  o Left – 95%
➢ Fingers for fine manipulations:
  o Right – 100%
  o Left – 100%
➢ Arms for reaching in front of her body
  o Right – 50%
  o Left 100%
➢ Arms for reaching overhead
  o Right – 40%
  o Left 95%

Id. at 1100.

On March 13, 2018, Claimant complained of right shoulder, right elbow, and left knee pain; reported that her range of motion had improved and that she was still undergoing physical therapy; and denied experiencing incoordination, dizziness, weakness, and feeling depressed or anxious.  Id. at 1103.  On general examination, Dr. Shaw noted that: Claimant was oriented to time, place, and person; her mood and affect were appropriate; she had good coordination; she had no weakness or sensory deficit; and her deep tendon reflexes were intact.  Id. at 1103–04.  On right shoulder examination, Dr. Shaw noted that: there was mild swelling and tenderness; there was no crepitus; there was mildly decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensation to light touch was intact; and her

deep tendon reflexes were normal.  Id. at 1104.  On left knee examination, Dr. Shaw noted that: there was mild swelling and tenderness; there was no crepitus; there was mildly decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in all muscle groups tested; her sensations were intact; her reflexes were normal and symmetrical; and her gait pattern was normal.  Id.  On right elbow examination, Dr. Shaw noted that: there was mild swelling and tenderness; there was mildly decreased range of motion secondary to pain and discomfort; Claimant's strength was rated a 4/5 in her wrist flexors and extensors and elbow flexors and extensors; her sensations were normal in all areas tested; and her reflexes were normal and symmetrical.  Id.  On exam of Claimant's right lower extremity, left upper extremity, neck, and low back, Dr. Shaw noted that: Claimant did not exhibit any tenderness, deformity, or injury; her range of motion was unremarkable; there was no gross instability; and her strength and tone were normal.  Id. at 1104–05.  Dr. Shaw recommended that Claimant continue with physical therapy. Id. at 1105.

### H.  James Fletcher, M.D. ("Dr. Fletcher")

From June 6, 2016 to June 20, 2017, Claimant visited Dr. Fletcher who diagnosed her with unspecified sprain of the right wrist.  Id. at 1062–85.

On June 6, 2016, Claimant complained of pain and discomfort in her right wrist, weakness, joint pain, and muscle stiffness; but she denied experiencing arthritis.  Id. at 1062.  On physical exam of her right arm, Dr. Fletcher noted that: Claimant had limited range of motion in her wrist secondary to discomfort; and she had dysesthesia along the radial aspect of her wrist.  Id.  Dr. Fletcher noted that Claimant would ultimately require an arthroscopy of the wrist with possible debridement and repair of the TFCC.  Id. at 1062–63.

On December 20, 2016, Claimant complained of radial nerve pain, dysesthesia, and shoulder discomfort.  Id. at 1064.  Dr. Fletcher noted that Claimant underwent an electromyogram

("EMG") of her right upper extremity on November 21, 2016, which showed that there were decreased amplitudes in the radial nerve as well as decreased velocity. Id. at 1069–70, 1082. Dr. Fletcher also noted that the results of the EMG, coupled with Claimant's physical symptoms, made her a candidate for neurolysis with revision of scar tissue of her right sensory branch of the radial nerve. Id.

On January 4, 2017, Dr. Fletcher excised scar tissue from Claimant's right wrist and performed a microscopic repair of the sensory branch of her radial nerve. Id. at 1083.

On January 26, 2017, Claimant reported experiencing less dysesthesia following the January 4, 2017 procedure. Id. at 1065. Dr. Fletcher noted that physical therapy would be initiated thereafter. Id.

On June 20, 2017, Dr. Fletcher noted that Claimant would continue range of motion and strengthening exercises. Id. at 1066.

On March 14, 2018, Dr. Fletcher completed a Physical Medical Source Statement for Claimant. Id. at 1159–62. Dr. Fletcher listed "RT. sensory nerve" as Claimant's diagnosis and pain and neuritis as her symptoms. Id. at 1159. Dr. Fletcher noted that Claimant's anxiety could affect her physical condition. Id. at 1160. Dr. Fletcher opined that, as a result of Claimant's impairments, she would have the following functional limitations if placed in a competitive work situation: she could sit and stand/walk for at least 6 hours, with normal breaks, in an 8-hour working day; she could occasionally lift and carry less than 10 pounds; she could rarely lift and carry 10 pounds; and she could never lift and carry either 20 or 50 pounds. Id. at 1160–61. Dr. Fletcher also opined that Claimant had significant limitations with reaching, handling, or fingering and indicated the following percentages of time during an 8-hour working day that she could use her hands/fingers/arms for the following activities:

> ➢ Hands to grasp, turn, and twist objects:

- o Right – 5%
- o Left – 100%
- ➢ Fingers for fine manipulations:
    - o Right – 10%
    - o Left – 100%
- ➢ Arms for reaching in front of her body and overhead
    - o Right – 5%
    - o Left 100%

Id. at 1161.

### I.   William Rodriguez, D.O. ("Dr. W. Rodriguez")

From November 3, 2016 to March 29, 2018, Claimant visited Dr. W. Rodriguez who diagnosed her with: radial nerve dysfunction; strain of muscle and tendon of the rotator cuff of the right shoulder; unspecified dislocation of right AC joint; sprain of right rotator cuff capsule; left anterior knee pain; protruded cervical disc; arthralgia of the knee; cervicalgia; and low back pain. Id. at 1168–216.

On November 3, 2016, Claimant denied experiencing dizziness, weakness, anxiety, and depressed mood.  Id. at 1210.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1209–10.

On November 17, 2016, Claimant complained of joint stiffness, muscle aches, painful joints, and sciatica; but she denied experiencing dizziness, carpal tunnel, pain in shoulder(s), swollen joints, weakness, anxiety, and depressed mood.  Id. at 1207.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower

extremities; and her sensory exam was intact.  Id. at 1206–07.

On December 5, 2016, Claimant denied experiencing dizziness, anxiety, and depressed mood.  Id. at 1205.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1204.

On January 6, 2017, Claimant denied experiencing dizziness, weakness, anxiety, and depressed mood; and Dr. W. Rodriguez noted that Claimant was oriented and had no concerns or complaints.  Id. at 1201–03.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1201–02.

On January 23, 2017, Claimant complained of muscle aches, pain in shoulder(s), and painful joints; but she denied experiencing dizziness, weakness, carpal tunnel, joint stiffness, sciatica, swollen joints, anxiety, and depressed mood.  Id. at 1199.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion, no costovertebral angle tenderness, paraspinal muscle spasm on the right and left, and cervical and lumbar tenderness; her musculoskeletal exam revealed a full range of motion, no swelling or deformity, and crepitus in her knees; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1198.

On February 27, 2017, Claimant complained of joint stiffness, muscle aches, pain in shoulder(s), painful joints, sciatica, swollen joints, tingling and numbness down her right arm

22

which radiated to the remainder of her body when laying down, bilateral knee pain, a cracking sensation when walking or bending the knee, and some instability; but she denied experiencing dizziness, weakness, carpal tunnel, anxiety, and depressed mood.  Id. at 1195–97.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion with increased pain in her cervical and lumbar spine, no costovertebral angle tenderness, paraspinal muscle spasm on the right and left, and cervical, thoracic, and lumbar tenderness; her musculoskeletal exam revealed decreased range of motion in her knee, no swelling or deformity, and crepitus in her knees; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1195.

On March 21, 2017, Claimant denied experiencing dizziness, weakness, balance difficulty, gait abnormality, loss of use of extremity, low back pain, memory loss, pain, tingling/numbness, anxiety, and depressed mood.  Id. at 1193–94.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1193.

On March 27, 2017, Claimant complained of continued cervical spine pain, stiffness of the neck and shoulder muscles, joint stiffness, muscle aches, pain in shoulder(s), painful joints, sciatica, and swollen joints; but she denied experiencing dizziness, weakness, carpal tunnel, anxiety, and depressed mood.  Id. at 1191–92.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a decreased range of motion, tenderness in her cervical and lumbar spine, no costovertebral angle tenderness, and paraspinal muscle spasm on the right and left; her musculoskeletal exam revealed a decreased range of motion in her shoulders, no swelling or deformity, and crepitus in her knees; her motor strength was

23

normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1191.

On March 30, 2017, Claimant complained of severe neck and low back pain; but she denied experiencing any numbness in her upper or lower extremities and had no other concerns at the time.  Id. at 1189.  On general examination, Dr. W. Rodriguez noted that: Claimant was alert and tearful due to pain; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1189.  Claimant was injected with a steroid and a nonsteroidal anti-inflammatory to alleviate her low back pain.  Id. at 1190.

On April 10, 2017, Claimant complained of joint stiffness, muscle aches, pain in shoulder(s), painful joints, sciatica, and anxiety; but she denied experiencing dizziness, weakness, carpal tunnel, swollen joints, and depressed mood.  Id. at 1187–88.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed tenderness and a decreased range of motion in her cervical and lumbar spine, no costovertebral angle tenderness, and paraspinal muscle spasm on the right and left; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1187.

On July 27, 2017, Claimant denied experiencing dizziness, weakness, anxiety, and depressed mood.  Id. at 1185.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. 1184.

On November 29, 2017, Claimant denied experiencing dizziness, weakness, anxiety, and

depressed mood.  Id. at 1182.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1181.

On December 14, 2017, Claimant denied experiencing dizziness, weakness, anxiety, and depressed mood.  Id. at 1178.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1178–79.

On January 26, 2018, Claimant denied experiencing dizziness, weakness, and anxiety.  Id. at 1175.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion and no costovertebral angle tenderness; her musculoskeletal exam revealed a full range of motion and no swelling or deformity; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1174–75.

On March 16, 2018, Claimant denied experiencing dizziness, weakness, and anxiety.  Id. at 1172–73.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion, no costovertebral angle tenderness, paraspinal muscle spasm on the right and left, and thoracic and lumbar tenderness; her musculoskeletal exam revealed a full range of motion, no swelling or deformity, crepitus in her knees, decreased range of motion in her shoulders and her cervical and lumbar spine; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at

25

1171–72.

On March 29, 2018, Claimant denied experiencing dizziness, weakness, anxiety, and depressed mood.  Id. at 1169–70.  On general examination, Dr. W. Rodriguez noted that: Claimant was not in acute distress; her back exam revealed a full range of motion, no costovertebral angle tenderness, paraspinal muscle spasm on the right and left, and thoracic and lumbar tenderness; her musculoskeletal exam revealed a full range of motion, no swelling or deformity, crepitus in her knees, and decreased range of motion in her shoulders and her cervical and lumbar spine; her motor strength was normal in her upper and lower extremities; and her sensory exam was intact.  Id. at 1168–69.

On May 21, 2018, Dr. W. Rodriguez completed a Physical Medical Source Statement for Claimant.  Id. at 1163–66.  Dr. W. Rodriguez assessed Claimant's diagnosis as radial nerve dysfunction and her symptoms as chronic pain, rated an 8/10 on most days, in her low back, right shoulder, bilateral hands, and bilateral knees.  Id. at 1163.  Dr. W. Rodriguez also noted that Claimant suffered from depression which could affect her physical condition.  Id. at 1164.  Dr. W. Rodriguez opined that, as a result of Claimant's impairments, she would have the following functional limitations if placed in a competitive work situation:

> ➢ She could: walk 2-3 city blocks without rest or severe pain; sit at one time for 2 hours before needing to get up; stand at one time for 2 hours before needing to sit down or walk around; sit and stand/walk for a total of about 2 hours, with normal breaks, in an 8-hour working day; rarely lift and carry less than 10 pounds; never lift and carry either 10, 20, or 50 pounds; occasionally twist, stoop, crouch/squat, and climb stairs; and never climb ladders.

> ➢ She required a job that permitted shifting positions at will from sitting, standing, or walking.

> ➢ She would need to take unscheduled breaks every hour for 5–10 minutes due to chronic fatigue, pain/paresthesias, and numbness.

> ➢ Her symptoms would likely be severe enough to interfere with the attention and concentration needed to perform even simple work tasks 25% or more of the workday.

> ➤ She was capable of low stress work due to episodes of pain that were exacerbated by stress.

Id. at 1164–66.  Dr. W. Rodriguez also opined that Claimant had significant limitations with reaching, handling, or fingering and indicated the following percentages of time during an 8-hour working day that Claimant could use her hands/fingers/arms for the following activities:

- ➤ Hands to grasp, turn, and twist objects:
  - o Right – 5%
  - o Left – 100%
- ➤ Fingers for fine manipulations:
  - o Right – 10%
  - o Left – 100%
- ➤ Arms for reaching in front of her body and overhead
  - o Right – 5%
  - o Left – 100%

Id. at 1165.

### J.   Hector Lalama, M.D. ("Dr. Lalama")

On November 21, 2016, Dr. Lalama performed the EMG referenced in Dr. Fletcher's notes from Claimant's December 20, 2016 visit.  Id. at 1069–70, 1082.

On November 30, 2016, Claimant visited Dr. Lalama and complained of pain and numbness in her right hand as well as shoulder pain.  Id. at 1073, 1075.  On physical and neurological evaluation, Dr. Lalama noted that: Claimant was not in acute distress; she was psychologically appropriate; she was alert and oriented x 3; her language was normal with intact comprehension; her fluency, repetition, and attention were intact; her muscle strength was symmetric in the upper and lower extremities with no focal weakness; she was intact to light touch; her deep tendon reflexes were normal and symmetrical;  she had normal gait with normal stride length; and she had a normal arm swing.  Id. at 1076.  Dr. Lalama also noted that Claimant was driving at the time, although she was not supposed to be.  Id. at 1075.

27

### K.  Sunset Radiology Inc.

On December 22, 2016, Claimant underwent imaging studies of her cervical spine, which showed central disc protrusion at C5–6 causing borderline central spinal canal stenosis.  Id. at 1067–68.

### L.  Alejandro Urrutia, M.D. ("Dr. Urrutia")

From June 16, 2017 to March 26, 2018, Claimant visited Dr. Urrutia, a psychiatrist, who diagnosed her with generalized anxiety disorder.  Id. at 1224–53.

On June 16, 2017, Claimant complained of anxiety and depression; but she denied experiencing dizziness, vertigo, and a sore neck.  Id. at 1244–45.  On mental status examination, Dr. Urrutia noted that: Claimant's appearance and affect were appropriate; her mood was euthymic; she was oriented to time, place, and person; she was alert; her memory and thought process were intact; her eye contact and concentration were good; her insight and judgment were fair; and her thought content was unremarkable.  Id. at 1245.  Dr. Urrutia also noted that Claimant's response to medical treatment was improving and no changes were made to her medication regimen. Id.

On October 27, 2017, Claimant complained of anxiety and depression; but she denied experiencing dizziness, vertigo, and a sore neck.  Id. 1240–41.  On mental status examination, Dr. Urrutia noted that: Claimant's appearance and affect were appropriate; her mood was depressed and anxious; she was oriented to time, place, and person; she was alert; her memory was impaired; her eye contact and concentration were good; her insight and judgment were fair; her thought process was intact; and her thought content was unremarkable.  Id. at 1241. Dr. Urrutia also noted that Claimant's response to medical treatment was well controlled and stable and no changes were made to her medication regimen.  Id.

On December 6, 2017, Claimant complained of anxiety and depression; but she denied

28

experiencing dizziness, vertigo, and a sore neck.  Id. at 1235–36.  On mental status examination, Dr. Urrutia noted that: Claimant's appearance and affect were appropriate; her mood was euthymic; she was oriented to time, place, and person; she was alert; her memory and thought process were intact; her eye contact and concentration were good; her insight and judgment were fair; and her thought content was unremarkable.  Id. at 1236.  Dr. Urrutia also noted that Claimant's response to medical treatment was well controlled and stable and no changes were made to her medication regimen.  Id.

On January 26, 2018, Claimant complained of anxiety and depression; but she denied experiencing dizziness, vertigo, and a sore neck.  Id. at 1230–32.  On mental status examination, Dr. Urrutia noted that: Claimant's appearance and affect were appropriate; her mood was euthymic; she was oriented to time, place, and person; she was alert; her memory and thought process were intact; her eye contact and concentration were good; her insight and judgment were fair; and her thought content was unremarkable.  Id. at 1232.  Dr. Urrutia also noted that Claimant's response to medical treatment was well controlled and stable and no changes were made to her medication regimen.  Id.

On March 26, 2018, Claimant complained of anxiety and depression; but she denied experiencing dizziness, vertigo, and a sore neck.  Id. at 1224, 1227.  On mental status examination, Dr. Urrutia noted that: Claimant's appearance and affect were appropriate; her mood was euthymic; she was oriented to time, place, and person; she was alert; her memory was impaired; her eye contact and concentration were good; her insight and judgment were fair; her thought process was intact; and her thought content was unremarkable.  Id. at 1227.  Dr. Urrutia also noted that Claimant's response to medical treatment was well controlled and stable and adjusted her medication regimen.  Id.

On April 9, 2018, Dr. Urrutia completed a Mental Medical Source Statement for Claimant.

Id. at 1218–23.  Dr. Urrutia assessed Claimant's diagnoses as generalized anxiety disorder and memory loss; he noted that Claimant was currently stable and compliant with her psychotropic medication regimen; and he identified her signs and symptoms as generalized persistent anxiety, emotional withdrawal or isolation, and memory impairment.  Id. at 1218–19.  Dr. Urrutia also noted that, based on the findings of Gustavo Fonte, Ph.D. ("Dr. Fonte"), a neuropsychologist, Claimant demonstrated severe cognitive limitations, specifically, deteriorated long and short-term memory levels.  Id. at 1218.  Dr. Urrutia opined that Claimant's ability to do work-related activities on a day to day basis in a regular work setting was as follows:

> ➢ Her ability to function in the following areas was limited but satisfactory: ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; interact appropriately with the general public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness.

> ➢ Her ability to function in the following areas was seriously limited and less than satisfactory, but not precluded in all circumstances: understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention for two hour segment; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; carry out detailed instructions; set realistic goals or make plans independently of others; travel in unfamiliar place; and use public transportation.

> ➢ She could not satisfactorily perform the following activities independently, appropriately, effectively, and on a sustained basis: remember work-like procedures; maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; deal with normal work stress; understand and remember detailed instructions; and deal with stress of semiskilled and skilled work.

Id. at 1220–21.  According to Dr. Urrutia, Claimant exhibited cognitive limitations that inhibited effective occupational participation, which was exemplified by significant memory loss and

borderline IQ; and the results of Claimant's neuropsychological exam performed by Dr. Fonte showed that she had a low average of intellectual functioning.  Id. at 1221.

## II.     Non-Treating Sources

### A.     State Agency Medical Consultant Cristina Rodriguez, M.D. ("Dr. C. Rodriguez")

On July 20, 2016, Dr. C. Rodriguez completed a Physical RFC Assessment of Claimant. Id. at 137–40.  Dr. C. Rodriguez opined that Claimant had the following exertional, postural, and environmental limitations:

➢ She had unlimited ability to: push and/or pull (other than shown for lift and/or carry below).

➢ She could frequently: lift and/or carry 10 pounds; balance; stoop; kneel; and crouch.

➢ She could occasionally: lift and/or carry 20 pounds; climb ramps/stairs and ladders/ropes/scaffolds; and crawl.

➢ She was able to sit and stand and/or walk, with normal breaks, for a total of about 6 hours in an 8-hour workday.

➢ She should avoid concentrated exposure to vibration and hazards (machinery, heights, etc.).

Id. at 137–39.  Dr. C. Rodriguez also opined that Claimant did not have any manipulative, visual, or communicative limitations.  Id. at 138.

### B.     State Agency Psychological Consultant Lawrence Annis, Ph.D. ("Dr. Annis")

On September 9, 2016, Dr. Annis opined that Claimant's anxiety disorders were not severe because they resulted in: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration.  Id. at 135–36.

### C.     Dr. Fonte

On December 7, 2017, Dr. Fonte conducted a neuropsychological evaluation of Claimant

31

at Dr. Urrutia's request.  Id. at 1086-96.  Dr. Fonte's diagnostic impression was that Claimant suffered from: major depression, recurrent/without psychotic features; neurocognitive disorder/severe; generalized anxiety disorder; and learning disorder, not otherwise specified.  Id. at 1094.  Dr. Fonte's conclusions were that: Claimant displayed a significant degree of cognitive impairment; her level of functioning "ha[d] limitations in her ability to manipulate and control . . . abstract symbols and [was] further affected by poor attention and concentration and an inability to encode new information, store such information, and retrieve it"; she had overt cognitive impairments and deficits in working memory at the short term and immediate levels; and she "ha[d] decreased memory abilities and inferior abstract decision making skills and problem solving abilities coupled with mental confusion and disorientation."  Id. at 1095–96.

## HEARING TESTIMONY

A hearing was held on April 25, 2018 before ALJ Hemming, at which Claimant and VE Lovely testified.  Id. at 48–103.

### I.   Claimant

Claimant testified that her past work history included employment as a cosmetologist, a hand packer, and a cargo agent.  Id. at 61–68.  Claimant also testified that she was involved in a motor vehicle accident on June 17, 2015, which resulted in: injuries to her shoulders, elbow, right wrist, and cervical spine; difficulties with her memory and her ability to maintain attention and concentration; vertigo; dizziness; and depression. Id. at 69, 83, 86–87.  Claimant explained that as a result of those injuries, she experienced: right wrist pain that was typically rated an 8/10 in severity; left shoulder pain that was typically rated a 6-7/10 in severity; right shoulder pain that was typically rated an 8/10 or 10/10 in severity; radiating back pain that was typically rated a 7-8/10 in severity; anxiety; and panic attacks.  Id. at 70–72, 82, 84.  Claimant further testified that because of her impairments, she was unable to: cook; pick up and hold objects; perform household

chores; stand at one time for more than 10 minutes;  sit at one time for more than 10-15 minutes; walk at one time for more than 15 minutes; travel to medical appointments without experiencing panic attacks; be around too many people at once; lift her right arm above her head; and reach in front of herself using her right arm without experiencing pain.  Id. at 69–72, 76, 80–83.  Claimant testified that she took medications for her physical and mental impairments, whose side effects included sleepiness, wanting to cry, and dizziness.  Id. at 72–75.

Irrespective of her impairments, Claimant testified that she was able to attend religious services and related events three times a week, which included small group meetings and services lasting 1.5 hours.  Id. at 77–79.  Claimant also testified that she was able to shower with the assistance of a stool and another individual to wash her hair and back.  Id. at 80–81.

## II.    VE Lovely

VE Lovely classified Claimant's prior work as follows:

➢ Hairdresser, DOT # 322.271-018,[7] with an exertional level of light and a Specific Vocational Preparation ("SVP") of 6.[8]  Id. at 87–88.

➢ Hand Packer, DOT # 920.587-018, with an exertional level of medium[9]  and an SVP of 2.[10]  Id. at 88.

➢ Cargo Agent, DOT # 248.367-018, with an exertional level of medium, and sometimes

---

[7] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups jobs based on their similarities, and defines the structure and content of all listed occupations.  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOTAPPC.

[8]  SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOTAPPC.
An SVP of 6 means that preparation for the job should take "[o]ver 1 year up to and including 2 years."  Id.

[9] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c) and 416.967(c).

[10] An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOTAPPC.

heavy,[11] and an SVP of 5.[12] Id.

ALJ Hemming posed a hypothetical to VE Lovely regarding an individual of Claimant's age, education, and work experience who could work at the light exertional level with the following limitations:

> unlimited push or pull using the left arm; frequently push or pull using the right arm; unlimited left-hand control; frequent right-hand controls; bilateral unlimited foot control; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, and crouch; occasionally crawl; unlimited ability to reach using her left arm and hand; frequently reach, including overhead reaching, with her right arm and hand; was right hand dominant; unlimited ability to handle objects with her left hand; frequently handle objects with her right hand; unlimited ability to finger bilaterally and feel bilaterally; unlimited exposure to environmental limitations, except could never have exposure to vibrations or hazards; was limited to simple, routine tasks that could be learned in 30 days or less; unlimited interaction with supervisors and coworkers; and frequent interaction with the public.

Id. at 91–93.

VE Hemming testified that the individual in the hypothetical would be unable to perform Claimant's past relevant work, but would be able to perform the following representative jobs:

> ➢ Housekeeper, DOT # 323.687-014, with an exertional level of light and an SVP of 2, with approximately 99,400 jobs in the national economy;
>
> ➢ Cashier, DOT # 211.462-010, with an exertional level of light and an SVP of 2, with approximately 180,000 jobs in the national economy; and
>
> ➢ Garment Sorter, DOT # 222.687-014, with an exertional level of light and an SVP of 2, with approximately 20,000 jobs in the national economy.

Id. at 92–93.

---

[11] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work."  20 C.F.R. §§ 404.1567(d) and 416.967(d).

[12] An SVP of 5 means that preparation for the job should take "[o]ver 6 months up to and including 1 year." See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOTAPPC.

**STANDARD OF REVIEW**

A federal court's "review of a social security case is demarcated by a deferential

reconsideration of the findings of fact and exacting examination of the conclusions of law."

Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial
> evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e.,
> the evidence must do more than merely create a suspicion of the existence of a fact,
> and must include such relevant evidence as a reasonable person would accept as
> adequate to support the conclusion. Where the Commissioner's decision is
> supported by substantial evidence, the district court will affirm, even if the reviewer
> would have reached a contrary result as finder of fact, and even if the reviewer finds
> that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However,

the Commissioner's "conclusions of law, including applicable review standards, are not presumed

valid."  Williams, 416 F. App'x at 862.

**REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS**

The Social Security Regulations outline a five-step "sequential" evaluation process used to

determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful

activity" ("SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find

that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In

this case, ALJ Hemming determined that Claimant had not engaged in SGA since the onset date

of June 17, 2015, and proceeded to step two.  TR. 22.

At the second step, the ALJ must determine if a claimant's impairments are "medically

severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or

she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Hemming found

that Claimant suffered from the following severe impairments: fracture of the upper extremity and

disorders of the muscle, ligament, and fascia.  TR. 22–25.  ALJ Hemming then proceeded to step three.  Id. at 25.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Phillips, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  Id.  Here, ALJ Hemming determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 25.  Therefore, ALJ Hemming proceeded to step four.  Id. at 25–29.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work."  Phillips, 357 F.3d at 1238.  As to the first prong, ALJ Hemming determined that Claimant had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except has unlimited push or pull using the left arm but can only frequently push or pull using the right arm; has unlimited left hand control but can only have frequent right hand controls; has bilateral unlimited foot control; occasionally climb ramps and stairs but should never . . . climb ladders, ropes or scaffolds; frequently balance, frequently stoop, frequently kneel, frequently crouch, but only occasionally crawl; unlimited ability to reach using her left arm and hand, but with respect to her right arm and hand, she can only reach frequently, including overhead reaching; she is right hand dominant; has unlimited ability to handle objects with her left hand but can only frequently handle objects with her right hand; unlimited ability to finger bilaterally and can feel in an unlimited fashion bilaterally; can have unlimited exposure to environmental limitations, all of them, except can never have exposure to vibrations and can never have exposure to hazards; limited to simple, routine tasks that can be learned in 30 days or less; can have unlimited interaction with supervisors, unlimited interaction with coworkers, but only frequent interaction with the public.

TR. 25–26.  ALJ Hemming moved to prong two of step four and concluded that Claimant was unable to perform any past relevant work.  Id. at 29.  ALJ Hemming then proceeded to the fifth and final step.  Id. at 30–31.

36

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC.  Phillips, 357 F.3d at 1239–40.  ALJ Hemming determined that, given Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy which Claimant could perform.  TR. 30.  Therefore, ALJ Hemming concluded that Claimant was not under a disability, as defined in the Social Security Act, from June 17, 2015 through the date of ALJ Hemming's Unfavorable Decision.  Id. at 31.

## DISCUSSION

As previously noted, Claimant argues that:

I.    The ALJ's step two and mental RFC findings are internally inconsistent, and the ALJ erred in rejecting the treating and examining medical source opinions regarding mental impairments and limitations.

II.   The ALJ's finding that Claimant had no limitation on finger use is unsupported by substantial evidence.

III.  The ALJ erred in rejecting the opinions of all three of Claimant's treating physicians and adopting a non-examining, projected opinion instead.

IV.   The ALJ failed to properly consider Claimant's allegations of pain and limitations.

See Claimant's Motion for Summary Judgment [D.E. 22 at 5–19].  The undersigned finds no merit in Claimant's arguments.

**I.    The ALJ's step two and mental RFC findings are internally inconsistent, and the ALJ erred in rejecting the treating and examining medical source opinions regarding mental impairments and limitations.**

As the basis for this objection to ALJ Hemming's Unfavorable Decision, Claimant argues that the ALJ erred by: (a) deeming Claimant's mental impairments non-severe at step two; (b) failing to account for any limitations in Claimant's mental functioning in his assessment of Claimant's mental RFC; and (c) improperly discounting Drs. Urrutia and Fonte's medical opinions

concerning Claimant's mental impairments.  See Claimant's Motion for Summary Judgment [D.E. 22 at 7–11].

      a.   The ALJ's step two assessment.

As noted above, at the second step of the five-step "sequential" evaluation process, the ALJ must determine if the claimant's impairments are "medically severe."  Phillips, 357 F.3d at 1237. In evaluating the severity of a claimant's mental impairments at step two, "the ALJ first evaluates the signs, symptoms, and laboratory findings to determine whether the claimant has a medically determinable mental impairment (called the 'paragraph A criteria')[.]"  McMahon v. Comm'r, Soc. Sec. Admin., 583 F. App'x 886, 888 (11th Cir. 2014) (citing 20 C.F.R. § 404.1520a(a)–(d)). The ALJ then considers the functional limitations caused by the medically determinable mental impairments on the claimant's ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself (called the "paragraph B criteria").  Dietz v. Comm'r of Soc. Sec., No. 19-CV-95, 2020 WL 929947, at *5 (M.D. Fla. 2020) (citing 20 C.F.R. § 404.1520a(c)(3)).  This method of evaluation is known as the Psychiatric Review Technique ("PRT").  Hines-Sharp v. Comm'r of Soc. Sec., 511 F. App'x 913, 915 (11th Cir. 2013).  If the ALJ finds that the degrees of functional limitations are "none" or "mild," the impairments will generally be found to be not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

"A non-severe impairment is a slight abnormality which has such a minimal effect on the individual that it could not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  Mayer v. Comm'r of Soc. Sec., No. 15-CV-315, 2016 WL 3965111, at *4 (M.D. Fla. 2016) (quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)).  "A severe impairment is an impairment or combination of impairments that

significantly limits a claimant's physical or mental ability to do basic work activities." Mayer,

2016 WL 3965111, at *4 (citing 20 C.F.R. § 404.1520(c)).

At step two of his analysis, ALJ Hemming utilized the PRT to assess Claimant's mental

impairments as follows:

> The claimant's medically determinable mental impairments of anxiety disorder and
> depression, considered singly and in combination, do not cause more than minimal
> limitation in the claimant's ability to perform basic mental work activities and are
> therefore non[-]severe.  Despite some symptoms of depression and anxiety at times,
> the claimant generally demonstrated an appropriate mood and affect despite some
> depression and anxiety at times (Ex. 1F/10; 28F/13, 22).   In addition, she was
> generally treated conservatively and showed a positive response to medication
> management (Ex. 28F/4, 13, 22).
>
> I have considered the four broad areas of mental functioning set out in the disability
> regulations for evaluating mental disorders and in the Listing of Impairments (20
> CFR, Part 404, Subpart P, Appendix 1).  These four areas of mental functioning are
> known as the "paragraph B" criteria.
>
> The first functional area is understanding, remembering, or applying information.
> In this area, the claimant has no limitation.  Despite alleging difficulties with
> memory, treatment notes generally indicated an intact recent and remote memory
> (Ex. 28F/9, 13, 22).  In addition, the claimant could adequately provide information
> about her health, follow instructions from healthcare providers, comply with
> treatment outside of a doctor's office or hospital, and respond to questions from
> medical providers.   In addition, the claimant could adequately understand and
> respond to questions at the hearing. As such, the claimant has no limitation in this
> area.
>
> The next functional area is interacting with others.  In this area, the claimant has a
> mild limitation.  The claimant testified that she has difficulty being around crowds
> and experiences panic attacks at every medical appointment.  However, treatment
> notes generally do not reference panic attacks during office visits.  Rather, they
> indicate that she was pleasant and cooperative with an appropriate mood and affect
> despite some anxiety and depression on occasion (Ex. 23F/2; 28F/13, 22).   In
> addition, she could spend time with others, engage in a romantic relationship, live
> with others, attend church regularly, and attend small groups at church, which
> suggests an intact capacity for basic social interaction (Testimony).  As such, the
> claimant has only a mild limitation in this area.
>
> The third functional area is concentrating, persisting, or maintaining pace.  In this
> area, the claimant has a mild limitation.  The claimant reported difficulties with
> concentration (Ex. 8F/2).  However, treatment notes generally indicate that she was
> alert with good attention and concentration (Ex. 20F/14; 28F/13, 22).  In addition,

she could regularly attend church services lasting one and a half hours, attend prayer and small groups meetings at church, and handle her own medical care, which suggests a capacity to focus and persist (Testimony). As such, the claimant has only a mild limitation in this area.

The fourth functional area is adapting or managing oneself. In this area, the claimant has a mild limitation. The claimant testified that she experiences panic attacks, excessive worry, and fear. However, she was generally described as cooperative and appropriately groomed with a normal mood and affect (Ex. 1F/4, 10; 28F/13, 22). In addition, she could perform self-care, drive, and attend health appointments as needed. Further, there is little indication that she acted inappropriately with medical staff or had difficulties controlling her behavior during office visits. As such, the claimant has only a mild limitation in this area.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are non[-]severe (20 CFR 404.1520a(d)(l) and 416.920a(d)(l)).

TR. 23–24. Claimant argues that ALJ Hemming erred in his step two analysis because his finding that Claimant's mental impairments were non-severe was inconsistent ALJ Hemming's determination that Claimant's mental RFC was: "limited to simple, routine tasks that can be learned in 30 days or less; can have unlimited interaction with supervisors, unlimited interaction with coworkers, but only frequent interaction with the public." See Claimant's Motion for Summary Judgment [D.E. 22 at 7–10].

However, any error in ALJ Hemming's designation of Claimant's mental impairments as non-severe was harmless because ALJ Hemming considered all of Claimant's impairments, severe and non-severe, when determining Claimant's RFC. See Mayer, 2016 WL 3965111, at *4–5 ("Thus, even assuming the ALJ erred when he concluded that Plaintiff's mental impairments were non-severe, that error was harmless, because the ALJ considered all of her impairments, including those she deemed non-severe, when determining Plaintiff's RFC.") (citing Reeves v. Heckler, 734 F.2d 519, 524 (11th Cir.1984)); see also Delia v. Comm'r of Soc. Sec., 433 F. App'x 885, 887 (11th Cir. 2011) (same).

b. <u>The ALJ's mental RFC assessment</u>

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p.[13] "The ALJ must consider all of a claimant's medically determinable impairments, even those not designated as severe." <u>Ehrisman v. Astrue</u>, 377 F. App'x 917, 919 (11th Cir. 2010) (citing 20 C.F.R. §§ 404.1545(a)(4) and 416.945(a)(4)). Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. "In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'" <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005) (alterations omitted) (quoting <u>Foote v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995)). The ALJ's "opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard." <u>Turner ex rel. Turner v. Barnhart</u>, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005) (citing <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981)). When substantial evidence supports the ALJ's decision, it must be affirmed. <u>Strickland v. Comm'r of Soc. Sec.</u>, 516 F. App'x 829, 831 (11th Cir. 2013) ("We may not reweight the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.") (citing <u>Dyer</u>, 395 F.3d at 1210).

_____

[13] SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC. SSR 96-8p, 1996 WL 374184 (July 2, 1996). According to this policy interpretation, the Commissioner is required to consider all relevant evidence in the case record in making the RFC determination. <u>Id.</u>; <u>see also</u> <u>Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)</u> ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

In his discussion of Claimant's RFC, ALJ Hemming explained that he considered: "all symptoms and the extent to which [those] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p"; "the functional limitations resulting from all of the claimant's medically determinable impairments, including those that are non-severe"; and "opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927."  TR. 25–26.

In reaching his conclusion as to Claimant's mental RFC, ALJ Hemming: incorporated his findings at step two into the RFC by stating, "the following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis"; and thoroughly discussed Claimant's physical impairments, adding that:

> In addition, while the claimant's mental impairments are non-severe, I have provided additional restrictions to simple, routine tasks with only frequent interactions with the public, to accommodate her symptoms of anxiety and depression, which could be exacerbated by pain from her physical impairments.

Id. at 27–28.

Given the foregoing analysis, ALJ Hemming did not err in his assessment of Claimant's mental RFC because he considered all of Claimant's medically determinable impairments, severe and non-severe; thoroughly discussed those impairments with enough detail to demonstrate that he gave all of the relevant evidence before him its due regard; and supported his mental RFC finding with substantial evidence.  See Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011) ("Though the PRT and RFC evaluations are undeniably distinct, nothing precludes the ALJ from considering the results of the former in his determination of the latter.") (citations omitted); Strickland, 516 F. App'x at 831 (11th Cir. 2013).

c.   The ALJ's weighing of Drs. Urrutia and Fonte's medical opinions

"The ALJ must consider medical opinions together with relevant evidence in the record."
Hand v. Soc. Sec. Admin., Comm'r, No. 18-14147, 2019 WL 4447206, at *3 (11th Cir. 2019)
(citing 20 C.F.R. § 404.1527(b)).  When weighing medical opinions, "the ALJ should consider the
following factors: the examining and treatment relationship between the claimant and doctor; the
supportability and consistency of the opinion with the record as a whole; the specialization of the
doctor; and other factors that tend to support or contradict the opinion."  Hand, 2019 WL 4447206,
at *3 (citing 20 C.F.R. § 404.1527(c)).

"Generally, a treating source's opinion is given 'substantial or considerable weight unless
good cause is shown to the contrary."  Lara v. Comm'r of Soc. Sec., 705 F. App'x 804, 811 (11th
Cir. 2017) (quoting Lewis, 125 F.3d at 1440).   Good cause exists when the: "(1) treating
physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding;
or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical
records."  Phillips, 357 F.3d at 1241 (citing Lewis, 125 F.3d at 1440).  "If the ALJ gives less than
controlling weight to a treating source's opinions, the ALJ must clearly articulate the reasons for
doing so."  Lara, 705 F. App'x at 811.  "When the ALJ has articulated specific reasons for failing
to give the opinion of a treating physician controlling weight, and those reasons are supported by
substantial evidence, there is no reversible error."  Weekley v. Comm'r of Soc. Sec., 486 F. App'x
806, 808 (11th Cir. 2012) (citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

Unlike a treating physician, a one-time examiner's opinion is generally not entitled to great
weight.  Hernandez v. Soc. Sec. Admin., Comm'r, 761 F. App'x 901, 903 (11th Cir. 2019) (citing
McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987)).  However, "the ALJ must still articulate
specific   reasons   supported   by   the   record   for   discounting   the   opinion."
Rodriguez v. Comm'r of Soc. Sec., No. 16-CV-1148, 2017 WL 2062995, at *2 (M.D. Fla. 2017)

(citing <u>Burke v. Astrue</u>, 09-CV-63, 2010 WL 1186760, at *9 (N.D. Fla. 2010)). Also, "[t]he opinion of a non-examining physician is generally entitled to little weight and, 'taken alone, do[es] not constitute substantial evidence.'" <u>Mitchell v. Comm'r of Soc. Sec.</u>, 15-CV-1703, 2017 WL 405424, at *3 (M.D. Fla. 2017) (one alteration in original) (quoting <u>Broughton v. Heckler</u>, 776 F.2d 960, 962 (11th Cir. 1985)).

> i.   <u>Dr. Urrutia's medical opinions</u>

ALJ Hemming discounted the medical opinions expressed by Dr. Urrutia in his Mental Medical Source Statement because they were not bolstered by the evidence and were inconsistent with the doctor's own medical records.  TR. 24.  ALJ Hemming explained:

> I accord little weight to the mental medical source statement completed by Alejandro Urrutia, MD provided on April 9, 2018 (Ex. 27F).  Dr. Urrutia relied heavily on the claimant's one-time neuropsychological evaluation by Dr. Fonte rather than on his own exams to formulate this opinion.  However, inconsistent with Dr. Fonte's evaluation, Dr. Urrutia's exams generally showed that the claimant's symptoms were well-controlled and stable with treatment (Ex. 28F/9, 13). Therefore, due to its inconsistency with the overall record, including his own exams, Dr. Urrutia's opinion is given little weight.

<u>Id.</u>

Because ALJ Hemming showed good cause, which was sufficiently supported by substantial evidence, for discounting Dr. Urrutia's medical opinions, there is no error in ALJ Hemming's weighing of Dr. Urrutia's medical opinions.  <u>Strickland</u>, 516 F. App'x at 831.

> ii.  <u>Dr. Fonte's medical opinions</u>

ALJ Hemming discounted the medical opinions expressed by Dr. Fonte in his report of Claimant's neuropsychological evaluation because he was a non-treating physician and his findings were not bolstered by the evidence.  TR. 24.  ALJ Hemming explained:

> I accord little weight to the opinion of Gustavo Fonte, PhD provided on December 12, 2017 (Ex. 21 F). Dr. Fonte's findings were based on a one-time exam and were not consistent with the longitudinal record, which generally showed an appropriate mood and affect despite some depression and anxiety at times, in addition to an

intact memory, good concentration, intact thought processes, and unremarkable thought content (Ex. lF/10; 28F/13, 22). In addition, the claimant was treated conservatively throughout the relevant period and showed a positive response to medication management, which does not support the severity of Dr. Fonte's findings (Ex. 28F/4, 13, 22).

Id.

Thus, ALJ Hemming articulated specific reasons for discounting Dr. Fonte's medical opinions, which were sufficiently supported by substantial evidence.  Strickland, 516 F. App'x at 831.

Claimant further argues that ALJ Hemming's decision to discount Dr. Fonte's medical opinions because they were based on a one-time exam was inconsistent with ALJ Hemming's assignment of great weight to Dr. Annis' medical opinions because Dr. Annis was a non-examining State Agency psychological consultant who rendered his opinion without reviewing the complete record.  See Claimant's Motion for Summary Judgment [D.E. 22 at 10].  However, ALJ Hemming reviewed the complete record; properly discounted Drs. Urrutia and Fonte's medical opinions; found that Dr. Annis' medical opinions were consistent with the overall record; and supported his determination to accord great weight to Dr. Annis' medical opinions with substantial evidence.  TR. 24.  Therefore, there is no inconsistency or error in ALJ Hemming's weighing of Drs. Annis or Fonte's medical opinions.  See Benefiel v. Colvin, No. 12-CV-1315, 2013 WL 4495170, at *7 (M.D. Fla. 2013) ("[W]hen the [ALJ] properly discounts the opinion of an examining or a treating physician, the [ALJ] may give substantial weight to the opinion of a non[-]examining reviewing source who is considered an expert in Social Security disability evaluation and whose opinion is consistent with the overall record.") (citing Milner v. Barnhart, 275 Fed. Appx. 947, 948 (11th Cir. 2008)); see also Besso v. Comm'r of Soc. Sec., No. 19-CV-276, 2020 WL 1271062, at *6–7 (M.D. Fla. 2020) ("[S]tate agency consultants are considered experts in Social Security disability evaluation and their opinions are entitled to great weight if supported by

45

evidence in the record.") (citing 20 C.F.R. §§ 404.1527(e)(2)(i) and 416.927(e)(2)(i)); Anderson

v. Colvin, No. 14-CV-256, 2015 WL 1347414, at *5 (M.D. Fla. 2015) (finding that the ALJ did

not err in according great weight to the medical opinions of non-examining physicians who did

not review the claimant's complete record because the ALJ, who had reviewed the entire record,

found that their opinions were consistent with the record as a whole); Virgin v. Comm'r of Soc.

Sec., No. 16-CV-763, 2017 WL 4277542, at *7 (M.D. Fla. 2017) (although the opinion of a non-

examining consultative physician is not, standing alone, good cause to discount the medical

opinions of a treating physician, "an ALJ is not prohibited from considering this evidence when

weighing the opinion of a treating physician.") (citing Straka-Acton v. Comm'r of Soc. Sec., No.

14-CV-630, 2015 WL 5734936, at *3 (M.D. Fla. 2015)).

## II.     The ALJ's assessment of Claimant's manipulative limitations

Claimant also argues that ALJ Hemming failed to properly consider Claimant's upper

extremity and hand limitations in his RFC assessment.   See Claimant's Motion for Summary

Judgment [D.E. 22 at 12–13].

As previously noted, ALJ Hemming found that Claimant had the physical RFC to:

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except has
unlimited push or pull using the left arm but can only frequently push or pull using
the right arm; has unlimited left hand control but can only have frequent right hand
controls; . . . unlimited ability to reach using her left arm and hand, but with respect
to her right arm and hand, she can only reach frequently, including overhead
reaching; she is right hand dominant; has unlimited ability to handle objects with
her left hand but can only frequently handle objects with her right hand; unlimited
ability to finger bilaterally and can feel in an unlimited fashion bilaterally. . . .

TR. 25–26.  In reaching that conclusion, ALJ Hemming articulated his rationale as follows:

While physical examinations showed tenderness and mild swelling, as well as a
reduced range of motion and strength in the right upper extremity at times,
treatment notes also indicate improvement following her surgeries.   She often
demonstrated full to almost full strength, a normal range of motion, intact reflexes,
and intact sensation at many other visits (Ex. 23F/29, 42; 26F/8, 12).   These
findings suggest that the claimant could perform lifting and carrying activities at

the light exertional level with frequent pushing, pulling, reaching, and handling limitations in her right upper extremity.  Furthermore, the claimant reported an improvement in strength and range of motion in the right upper extremity with regular treatment, including with consistent physical therapy sessions (Ex. 23F/l, 4, 13).

Therefore, based on the medical evidence of record, the evidence does not reveal limitations beyond those outlined in the residual functional capacity finding above. However, in consideration of her fracture of the upper extremity, disorders of the muscle, ligament, and fascia, and any associated symptoms, I have limited the claimant to a range of light work with additional pushing, pulling, postural, reaching, manipulative, and environmental limitations.

TR. 27–28.

ALJ Hemming's Unfavorable Decision reflects that he considered Claimant's medical condition as a whole and that he gave all of the relevant evidence before him its due regard, and supported his articulated physical RFC with substantial evidence.  Dyer, 395 F.3d at 1211; Turner ex rel. Turner, 377 F. Supp. at 1168 (M.D. Ala. 2005); Strickland, 516 F. App'x at 831.  Therefore, there is no error in the ALJ's assessment of Claimant's manipulative limitations.

### III.   The ALJ's weighing of the opinions of Claimant's three treating physicians, Drs. Fletcher, Shaw, and W. Rodriguez, and non-examining physician Dr. C. Rodriguez.

Claimant argues that ALJ Hemming erred by improperly weighing Drs. Fletcher, Shaw, W. Rodriguez, and C. Rodriguez's medical opinions concerning Claimant's physical impairments. See Claimant's Motion for Summary Judgment [D.E. 22 at 13–15].

a.   Dr. Fletcher's medical opinions

ALJ Hemming discounted the medical opinions expressed by Dr. Fletcher in his Physical Medical Source Statement because his findings, particularly those concerning Claimant's severe manipulative limitations, were not bolstered by the evidence.  TR. 29.  ALJ Hemming explained:

I accord little weight to the medical source statement provided by J. Fletcher, MD on March 14, 2018 (Ex. 24F).  While his opinion that the claimant could sit, stand, and walk for six hours is supported by the record, I find that his other findings, particularly his severe manipulative limitations, are not supported by the evidence.

> Concurrent progress notes indicate some mild swelling, tenderness, and decreased range of motion in the right shoulder and elbow at times (Ex. 23F/2, 5). However, they also indicate full to almost full strength, normal sensation, and intact reflexes in the extremities at subsequent visits (Ex. 23F/2; 26F/2, 5). These findings are inconsistent with the severity of reaching and manipulative limitations assessed by Dr. Fletcher.

Id. Because ALJ Hemming showed good cause, which was sufficiently supported by substantial evidence, for discounting Dr. Fletcher's medical opinions, there is no error in the ALJ's weighing of Dr. Fletcher's medical opinions. Strickland, 516 F. App'x at 831.

    b.  Drs. Shaw and W. Rodriguez's medical opinions

ALJ Hemming discounted the medical opinions expressed by Drs. Shaw and W. Rodriguez's in their respective Physical Medical Source Statements because their findings were not bolstered by the evidence and were inconsistent with their own medical records. TR. 28. ALJ Hemming explained:

> I accord little weight to the medical source statements provided by Jesse Shaw, DO and Dr. [W.] Rodriguez (Ex. 22F; 25F). Their severe limitations are inconsistent with the record, including their own treatment notes, which often showed full to almost full strength, an intact range of motion, and intact sensation despite complaints of pain, swelling, and a decreased range of motion at times (Ex. 26F /17, 26). In addition, the record shows gradual improvement with treatment, including physical therapy, which is inconsistent with the severity of the findings in their opinions (Ex. 23F/l, 4).

Id. at 28–29. Because ALJ Hemming showed good cause, which was sufficiently supported by substantial evidence, for discounting Drs. Shaw and W. Rodriguez's medical opinions, there is no error in the ALJ's weighing of those medical opinions. Strickland, 516 F. App'x at 831.

    c.  Dr. C. Rodriguez's medical opinions

Claimant argues that ALJ Hemming's decision to accord great weight to Dr. C. Rodriguez's medical opinions was erroneous because she was a non-examining State Agency medical consultant, who specialized in pediatrics, and rendered her medical opinions without reviewing the complete record. See Claimant's Motion for Summary Judgment [D.E. 22 at 13–

14].

However, ALJ Hemming reviewed the complete record; properly discounted Drs. Fletcher, Shaw, and W. Rodriguez's medical opinions; found that Dr. C. Rodriguez's medical opinions were generally consistent with the overall record; and supported his determination to accord great weight to Dr. C. Rodriguez's medical opinions with substantial evidence.  TR. 28.  Therefore, there is no error in ALJ Hemming's weighing of Dr. C. Rodriguez's medical opinions.  Benefiel, 2013 WL 4495170, at *7; Besso, 2020 WL 1271062, at *6–7; Anderson, 2015 WL 1347414, at *5; Virgin, 2017 WL 4277542, at *7.

### IV.     The ALJ's assessment of Claimant's alleged pain and limitations.

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms."  Contreras-Zambrano v. Soc. Sec. Admin., Comm'r, 724 F. App'x 700, 703 (11th Cir. 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,462, 49,463-64 (Oct. 25, 2017)).  "Step two is to evaluate the intensity and persistence of an individuals' symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities."  Contreras-Zambrano, 724 F. App'x at 703 (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66).  "An ALJ considers whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]."  20 C.F.R. § 404.1529(c)(4).  SSR 16-3p, effective October 25, 2017, clarified that "subjective symptom evaluation is not an examination of an individual's character."  82 Fed. Reg. at 49,463.

In his Unfavorable Decision, ALJ Hemming stated:

The claimant alleges disability due to the combined effects of multiple physical

impairments.  At the hearing, the claimant indicated that she has cervical spine and right upper extremity injuries from a motor vehicle accident (Testimony).  She testified to pain radiating from her neck down to her legs.  In addition, she reported ongoing pain, numbness, tingling and limitations in range of motion in her upper right extremity (Testimony).  She further testified to difficulties grasping and holding items with her right hand.  She also reported vertigo, as well as side effects of medication including drowsiness and dizziness.  Due to her impairments, she reported that she could only sit for ten to 15 minutes, stand for ten minutes, and walk for 15 minutes (Testimony).

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . .

TR. 26–27.  ALJ Hemming supported his finding by citing to record evidence and Claimant's own testimony indicating: that she often demonstrated full to almost full strength, a normal range of motion, intact reflexes, and intact sensation;  that she reported an improvement in strength and range of motion in the right upper extremity with regular treatment, including with consistent physical therapy sessions; that she frequently demonstrated a normal gait without a limp or use of an assistive device and a normal range of motion with intact strength in her neck, low back, and left knee; and that she could still perform activities of daily living including self-care, driving, attending church, and attending medical appointments.  Id. at 28.

Because ALJ Hemming supported his findings regarding Claimant's allegations of the intensity, persistence, and limiting effects of her symptoms with substantial evidence, there is no error in the ALJ's assessment of Claimant's alleged pain and limitations.  See Strickland, 516 F. App'x at 831.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned **RESPECTFULLY RECOMMENDS** that Claimant's Motion for Summary Judgment [D.E. 22] be **DENIED**, the

Commissioner's Motion for Summary Judgment [D.E. 24] be **GRANTED**, and the Commissioner's decision be **AFFIRMED**.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **_fourteen_ days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez.  Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Miami, Florida this 24th day of August, 2020.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:   United States District Judge Jose E. Martinez
      Counsel of Record

51